# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| JULIE HOWARD, Derivatively On Behalf Of GENOCEA BIOSCIENCES, INC., | ) ) ) | Civil Action No.: |
| Plaintiff, | ) ) ) | **VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT** |
| vs. | ) ) ) ) | |
| WILLIAM CLARK, KENNETH BATE, RONALD COOPER, KATRINE BOSLEY, GEORGE SIBER, MICHAEL HIGGINS, HOWARD MAYER, and JONATHAN POOLE, | ) ) ) ) ) ) | **DEMAND FOR JURY TRIAL** |
| Defendants, | ) ) ) | |
| and, | ) ) ) | |
| GENOCEA BIOSCIENCES, INC., | ) ) ) | |
| Nominal Defendant. | ) ) ) ) ) | |

Plaintiff Julie Howard ("Plaintiff"), by and through her undersigned counsel, derivatively on behalf of Nominal Defendant Genocea BioSciences, Inc. ("Genocea" or the "Company"), submits this Verified Shareholder Derivative Complaint (the "Complaint"). Plaintiff's allegations are based upon her personal knowledge as to herself and her own acts, and upon information and belief, developed from the investigation and analysis by Plaintiff's counsel, including a review of publicly available information, including filings by Genocea with the U.S. Securities and Exchange Commission ("SEC"), press releases, news reports, analyst reports, investor conference transcripts, publicly available filings in lawsuits, and matters of public

record.

## NATURE OF THE ACTION

1.       This is a shareholder derivative action brought in the right and for the benefit of the Company against certain its officers and directors seeking to remedy Defendants' (defined below) violations of Section 14(a) of the Securities Exchange Act of 1934, breach of fiduciary duties, unjust enrichment and waste of corporate assets that occurred between August 4, 2016 and the present (the "Relevant Period") and have caused significant harm to the Company.

2.       Defendants recklessly made and/or caused the Company to make, and/or failed to correct and/or caused the Company to fail to correct false and/or misleading statements and omissions of material fact that: (a) the Company's finances were insufficient to support Phase 3 trials of GEN-003; (b) the Company had overstated the prospects for GEN-003; (c) the Company failed to maintain adequate internal controls; and (d) the Company's public statements were materially false and misleading at all relevant times.  Defendants violated Section 14(a) of the Securities Exchange Act of 1934 in that they failed to disclose the same in a proxy statement. Further, the proxy statement, which solicited that three (3) members of the Board of Directors ("Board") be re-elected, misleadingly stated that: (a) the Board and the Company's Audit Committee provided adequate oversight and ability to manage risks, and to control exposure to financial risks; and (b) adequate controls were in place to ensure management brought significant matters to the attention of the Board.

## JURISDICTION

3.       This Court has jurisdiction pursuant to 28 U.S.C. § 1331 because the Complaint alleges a claim for violations of Section 14(a) of the Securities Exchange Act of 1934 and SEC Rule 14a-9.  The Court has supplemental jurisdiction over the pendent state law claims pursuant

to 28 U.S.C. § 1367(a) because the state law claims form part of the same case or controversy.

4.      Venue is proper in this Court because one or more of the defendants either resides in or maintains offices in this District, a substantial portion of the transactions and wrongs complained of herein, including Defendants' primary participation in the wrongful acts detailed herein and violation of fiduciary duties owed to the Company occurred in this District, and Defendants have received substantial compensation in this District by doing business here and engaging in numerous activities that had an effect in this District.

**PARTIES**

**A.      Plaintiff**

5.      *Plaintiff Julie Howard* is, and was, a shareholder of the Company during the time Defendants were breaching their fiduciary duties.  Plaintiff will fairly and adequately represent the interests of the shareholders in enforcing the rights of the corporation.

**B.      Nominal Defendant**

6.      *Nominal Defendant Genocea* is a biopharmaceutical company that develops vaccines and immunotherapies.  The Company's genital herpes immunotherapy product GEN-003 was its lead product candidate.

**C.      Director Defendants**

7.      *Defendant William Clark* ("Clark") has served as a director of the Company, and as the Company's President and Chief Executive Officer ("CEO") since February 2011. Defendant Clark is a named defendant in the securities class actions entitled *Walker v. Genocea BioSciences, Inc., et al.*, Case 1:17-cv-12474 (D. Mass.), *Emmerson v. Genocea BioSciences, Inc., et al.*, Case 1:17-cv-12137 (D. Mass.), and *Heaney v. Genocea BioSciences, Inc., et al.*, Case 1:17-cv-12168 (D. Mass.) (collectively, the "Securities Class Actions").

8.      As of March 31, 2017, Defendant Clark beneficially owned 820,384 shares of the Company's common stock, which represented 2.9% of the Company's outstanding stock as of that date. Given that the price per share of the Company's common stock at the close of trading on March 31, 2017 was $6.09, Clark beneficially owned over $4.99 million worth of Genocea stock.

9.      For the fiscal year ended December 31, 2016, Defendant Clark received $1,192,837 in compensation from the Company. This included $455,497 in salary, $548,300 in option awards, $184,000 in non-equity incentive plan compensation, and $5,040 in all other compensation.

10.     **Defendant Kenneth Bate** ("Bate") has been a director of the Company since September 2014.  Defendant Bate is the Chairman of the Compensation Committee and a member of the Audit Committee.  As of March 31, 2017, Defendant Bate beneficially owned 11,764 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on March 31, 2017 was $6.09, Bate beneficially owned $71,642.76 worth of Genocea stock.

11.     **Defendant Ronald Cooper** ("Cooper") has served as a director of the Company since June 2016.  Defendant Cooper is a member of both the Nominating and Corporate Governance Committee and the Audit Committee.

12.     **Defendant Katrine Bosley** ("Bosley") has been a director of the Company since March 2013 and Chair of the Board since August 2013.  Defendant Bosley is Chair of the Nominating and Corporate Governance Committee.  As of March 31, 2017, Defendant Bosley beneficially owned 69,249 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on March 31, 2017 was $6.09,

Bosley beneficially owned $421,726.41 worth of Genocea stock. For the fiscal year ended December 31, 2016, Defendant Bosley received $126,924 in compensation from the Company. This included $85,750 in fees earned or paid in cash and $41,174 in option awards.

13.     **Defendant George Siber** ("Siber") has been a director of the Company since 2007. As of March 31, 2017, Defendant Siber beneficially owned 122,796 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on March 31, 2017 was $6.09, Siber beneficially owned $747,827.64 worth of Genocea stock. Further, for the fiscal year ended December 31, 2016, Defendant Siber received $147,302 in compensation from the Company. This included $106,128 in fees earned or paid in cash and $41,174 in option awards.

14.     **Defendant Michael Higgins** ("Higgins") has been a director of the Company since February 2015. Defendant Higgins is Chairman of the Audit Committee. As of March 31, 2017, Defendant Higgins beneficially owned 6,722 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on March 31, 2017 was $6.09, Higgins beneficially owned $40,936.98 worth of Genocea stock. For the fiscal year ended December 31, 2016, Defendant Higgins received $91,174 in compensation from the Company. This included $50,000 in fees earned or paid in cash and $41,174 in option awards.

15.     **Defendant Howard Mayer** ("Mayer") has been a director of the Company since March 2017. Defendant Mayer is a member of the Compensation Committee.

16.     Defendants Bate, Clark, Cooper, Bosley, Siber, Higgins, and Mayer are collectively referred to herein as the "Director Defendants."

**D.     Officer Defendants**

17.     **Defendant Jonathan Poole** ("Poole") has served as Chief Financial Officer ("CFO") of the Company since April 2014.  Defendant Poole is named as a defendant in the Securities Class Actions.

18.     Defendants Clark, Bate, Cooper, Bosley, Siber, Higgins, Myer, and Poole are hereinafter referred to as the "Individual Defendants."

**Non-Party**

19.     **Dr. Ali Behbahani** has served as a member of the Board since January 2018.

## CODE OF BUSINESS CONDUCT AND ETHICS

20.     As members of the Company's Board, were held to the highest standards of honesty and integrity and charged with overseeing the Company's business practices and policies and assuring the integrity of its financial and business records.

21.     The conduct of Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of the Company, the absence of good faith on their part, and a reckless disregard for their duties to the Company and its investors that Defendants were aware posed a risk of serious injury to the Company.

## DUTIES OF DEFENDANTS

22.     By reason of their positions as officers and/or directors of the Company, and because of their ability to control the business and corporate affairs of the Company, Defendants owed the Company and its investors the fiduciary obligations of trust, loyalty, and good faith. The obligations required Defendants to use their utmost abilities to control and manage the Company in an honest and lawful manner.  Defendants were and are required to act in furtherance of the best interests of the Company and its investors.

23.     Each director of the Company owes to the Company and its investors the

fiduciary duty to exercise loyalty, good faith, and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets.  In addition, as officers and/or directors of a publicly held company, Defendants had a duty to promptly disseminate accurate and truthful information with regard to the Company's operations, finances, and financial condition, as well as present and future business prospects, so that the market price of the Company's stock would be based on truthful and accurate information.

24.     To discharge their duties, the officers and directors of the Company were required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the affairs of the Company.  By virtue of such duties, the officers and directors of the Company were required to, among other things:

(a)     ensure that the Company complied with its legal obligations and requirements, including acting only within the scope of its legal authority and disseminating truthful and accurate statements to the SEC and the investing public;

(b)     conduct the affairs of the Company in an efficient, businesslike manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c)     properly and accurately guide investors and analysts as to the true financial condition of the Company at any given time, including making accurate statements about the Company's business prospects, and ensuring that the Company maintained an adequate system of financial controls such that the Company's financial reporting would be true and accurate at all times;

(d)     remain informed as to how the Company conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices,

make reasonable inquiries in connection therewith, take steps to correct such conditions or practices, and make such disclosures as necessary to comply with federal and state securities laws;

(e)     ensure that the Company was operated in a diligent, honest, and prudent manner in compliance with all applicable federal, state and local laws, and rules and regulations; and

(f)     ensure that all decisions were the product of independent business judgment and not the result of outside influences or entrenchment motives.

25.     Each of the Defendants, by virtue of his/her position as a director and/or officer, owed to the Company and to its shareholders the fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets.  The conduct of Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of the Company, the absence of good faith on their part, and a reckless disregard for their duties to the Company and its shareholders that Defendants were aware, or should have been aware, posed a risk of serious injury to the Company.

## AUDIT COMMITTEE CHARTER

26.     Pursuant to the Audit Committee Charter, the Audit Committee is appointed by the Board for the primary purposes of:

- Assisting the Board in fulfilling its oversight responsibilities as they relate to the Company's accounting policies and internal controls, financial reporting practices and legal and regulatory compliance, including, among other things:

  - Monitoring the integrity of the Company's financial statements, corporate accounting and financial reporting processes and financial information that will be provided to stockholders and

others;

- o reviewing the Company's compliance with certain legal and regulatory requirements;

- o evaluating the independent auditors' qualifications and independence; and

- o monitoring the performance of the Company's internal audit function and the Company's independent auditors as well as any other public accounting firm engaged to perform other audit, review or attest services;

- Maintaining, through regularly scheduled meetings, a line of communication between the Board and the Company's financial management, internal auditors and independent auditors,

- Preparing the report to be included in the Company's annual proxy statement, as required by the Securities and Exchange Commission's ("SEC") rules, and

- Annually evaluating the performance of the Committee.

\*     \*     \*

**System of Financial Control**

The Committee shall oversee the process by which management shall design, implement, amend, maintain, and enforce a comprehensive system of financial controls (including the right internal and external people and resources, policies, processes and enforcement) aimed at ensuring the integrity and compliance of the Company's books and records with generally accepted accounting principles ("GAAP") and sound business practices, as well as protecting the value of the Company's assets and safeguarding the credibility of its brand, employees, management team, board of directors, and stockholders. Such system of financial controls will embody the adoption of best practices in financial controls and foster honesty, integrity, accuracy, and transparency in all aspects of the Company. Best practices include but are not limited to: setting the right tone at the top; active review of business unit performance by executive management, with regular reporting to and oversight by the Board of Directors; an accurate, stable and reliable general ledger; unambiguous compliance with GAAP; and full transparency and ongoing dialogue with the Board of Directors, Audit Committee and external auditors. Such system shall also incorporate the principals contained within the Company's Code of Business Conduct and Ethics, as adopted by the Board.

**Annual Audit Review**

Review and discuss the annual audited financial statements including the independent auditors' audit and audit report thereon, and the Company's disclosures under "Management's Discussion and Analysis of Financial Condition and Results of Operations" with management and the independent auditors. In connection with such review, the Committee will:

- Review the scope of the audit, the audit plan and the audit procedures utilized;

- Discuss with the independent auditors the matters required to be discussed by Statement on Auditing Standards No. 61 (as may be modified or supplemented) and the matters in the written disclosures required by applicable requirements of the Public Company Accounting Oversight Board regarding the independent accountant's communications with the audit committee concerning independence;

- Review significant changes in accounting or auditing practices, principles or policies;

- Review with the independent auditors any problems or difficulties encountered in the course of their audit, including any change in the scope of the planned audit work and any restrictions placed on the scope of such work or access to requested information, and any significant disagreements with management, and management's response to such problems or difficulties;

- Review with the independent auditors, management the adequacy of the Company's internal controls, including information systems controls and security and bookkeeping controls and any significant findings and recommendations with respect to such controls;

- Review reports required to be submitted by the independent auditor concerning: (a) all critical accounting policies and practices used; (b) all alternative treatments of financial information within GAAP that have been discussed with management, the ramifications of such alternatives, and the accounting treatment preferred by the independent auditors; and (c) any other material written communications with management, such as the management letter or schedule of unadjusted differences;

- Review (a) major issues regarding accounting principles and financial statement presentations, including any significant changes in the Company's selection or application of accounting principles, and major issues as to the adequacy of the Company's internal controls and any special audit steps adopted in light of material control deficiencies; and (b)

analyses prepared by management and/or the independent auditor setting forth significant financial reporting issues and judgments made in connection with the preparation of the financial statements, including analysis of the effects of alternative GAAP methods on the financial statements and the effects of regulatory and accounting initiatives, as well as off-balance sheet structures, on the financial statements of the Company.

Inquire about and review with management and the independent auditors any significant risks or exposures faced by the Company and discuss with management the steps taken to minimize such risk or exposure. Such risks and exposures include, but are not limited to, threatened and pending litigation, claims against the Company, tax matters, regulatory compliance and correspondence from regulatory authorities, and environmental exposure; and

Discuss policies and procedures concerning earnings press releases and review the type and presentation of information to be included in earnings press releases (paying particular attention to any use of "pro forma" or "adjusted" non-GAAP information), as well as financial information and earnings guidance provided to analysts and rating agencies.

*   *   *

**Review of Internal Controls**

Review with management, the independent auditors and the senior internal auditing executive the adequacy of the Company's internal controls, and any significant findings and recommendations with respect to such controls.

<strong><u>FALSE AND MISLEADING STATEMENTS</u></strong>

27.     On August 04, 2016, Defendants caused the Company to issue a press release that announced that the Phase 3 program for GEN-003 was expected to initiate in the second half of 2017. The press release stated in relevant part:

Around the end of 2016, Genocea expects to report 6-month clinical efficacy data from this Phase 2b trial. The placebo-controlled data will represent the first opportunity to measure GEN-003 against potential Phase 3 clinical endpoints at 6-months after dosing.

Following these two data readouts, Genocea expects to conduct an end-of-Phase 2 meeting with the FDA in the first quarter of 2017. ***During this meeting, the company will confirm the Phase 3 program for GEN-003, which it expects to initiate in the second half of 2017.*** [Emphasis added].

11

28.     On September 29, 2016, Defendants caused the Company to issue a press release

that confirmed that the Phase 3 program for GEN-003 was expected to initiate in the second half

of 2017.  The press release stated in relevant part:

### Genocea's Genital Herpes Immunotherapy GEN-003 Demonstrates Significant Reduction of Viral Shedding in Phase 2b Clinical Trial

-       Trial achieves primary endpoint
-       Dose confirmed for subsequent trials
-       ***Phase 3 expected to start in 2H 2017***
-       Company to host conference call at 9 a.m. ET today

CAMBRIDGE, Mass., September 29, 2016 --(GLOBE NEWSWIRE) — Genocea Biosciences, Inc. (NASDAQ: GNCA), a biopharmaceutical company developing T cell-directed vaccines and immunotherapies, today announced positive results from its ongoing Phase 2b trial evaluating a new Phase 3-ready formulation of GEN-003 for the treatment of genital herpes.  The study achieved its primary endpoint, with GEN-003 demonstrating a statistically significant reduction of 40 percent in the rate of viral shedding in the 60 μg per protein / 50 μg of Matrix-M2 dose group compared to both baseline and placebo.  The viral shedding rate reduction for this dose was consistent with its performance at the same time point in a prior Phase 2 trial.

"We are very encouraged by this positive data and have now selected a dose of 60 μg per protein / 50 μg of Matrix-M2 of GEN-003 for our planned Phase 3 trials. This is the third consecutive trial in which GEN-003 has demonstrated a statistically significant reduction in viral activity immediately post-dosing.  In the previous Phase 2 trial, success in this measure translated into a significant impact on genital herpes clinical disease, durable to at least 12 months," said Chip Clark, president and chief executive officer of Genocea.  "This body of data supports our strong belief that GEN-003 could be a cornerstone treatment for genital herpes. ***We look forward to reporting six-month placebo-controlled clinical data from this trial in January 2017 and expect to commence our Phase 3 program in the second half of 2017.***"  [Emphasis added].

29.     On November 03, 2016, Defendants caused the Company to issue a press release

that ratified that the Phase 3 program for GEN-003 was expected to initiate in the second half of

2017.  The press release stated in relevant part:

### Genocea Reports Third Quarter 2016 Financial Results

- Positive Phase 2b results recently reported and dose selected for GEN-003 Phase 3 program expected to initiate in 2H 2017

- Conference Call at 9am ET today

CAMBRIDGE, Mass., November 3, 2016 - Genocea Biosciences, Inc. (NASDAQ: GNCA), a company developing T cell-directed vaccines and immunotherapies, today reported corporate highlights and financial results for the third quarter ended September 30, 2016. Genocea's lead clinical candidate, GEN-003, is a T cell directed immunotherapy for the treatment of genital herpes infections, designed to elicit both a T cell and B cell (antibody) immune response that, if approved, we believe would be the first-ever therapeutic vaccine for an infectious disease.

"We achieved an important GEN-003 milestone in the third quarter with the selection of our Phase 3 dose, demonstrating a significant reduction in viral shedding for the third consecutive clinical trial, this time with an improved, Phase 3-ready formulation," said Chip Clark, president and chief executive officer of Genocea. "We also continue to advance our immuno-oncology program and are now focusing all of our early stage research and pre-clinical resources to these efforts. We believe ATLAS enables better cancer vaccine antigen selection than existing methods and that our demonstrated vaccine development expertise can be a further competitive advantage in this exciting space."

Mr. Clark continued: "We expect to maintain our strong momentum this quarter and throughout 2017. ***In December, we will be hosting our first R&D day as we set the stage for the expected start of the GEN-003 Phase 3 clinical trials in the second half of 2017, including the important Phase 2b six-month placebo controlled clinical efficacy data expected in January 2017***. We will also set out in detail our maturing immuno-oncology strategy and neoantigen cancer vaccine development plans." [Emphasis added].

30.     On November 04, 2016, Defendants caused the Company to file a Form 10-Q ("2016 Q3 10-Q") with the SEC, for the third fiscal quarter ended September 30, 2016, that stated that the Company expected to have sufficient resources to fund the expenses for the Phase 3 trial, without the need to pursue debt or equity financing. In the 2016 Q3 10-Q, the Company stated relevant part:

**Liquidity**

As of September 30, 2016, the Company had an accumulated deficit of approximately $191.4 million. The Company had cash, cash equivalents and

investments of $75.5 million at September 30, 2016. *On the basis of current operating plans, including the plan to focus research investments on immunooncology and the planned commencement of Phase 3 trials for GEN-003 in the second half of 2017, it expects that these funds will be sufficient to fund operating expenses and capital expenditure requirements into the first quarter of 2018, without assuming any receipt of proceeds from potential business development partnerships, equity financings or debt drawdowns.* [Emphasis added].

31.     On January 05, 2017, Defendants caused the Company to issue a press release that stated that the Phase 3 program for GEN-003 was expected to initiate in the second half of 2017. The press release stated in relevant part:

### Genocea Announces Positive 6-Month Results from GEN-003 Phase 2b Clinical Trial

-       Trial meets statistical significance vs. placebo for multiple clinical endpoints through six months - End of Phase 2 meeting with FDA expected in Q1 2017

-       Phase 3 launch expected in Q4 2017

-       GEN-003 has potential to be first new treatment for genital herpes infections in more than 20 years

-       Company to host conference call at 9 a.m. ET today

CAMBRIDGE, Mass., January 5, 2017 -- (GLOBE NEWSWIRE) — Genocea Biosciences, Inc. (NASDAQ: GNCA), a biopharmaceutical company developing T cell-directed vaccines and immunotherapies, today announced positive clinical results from a planned interim analysis of its ongoing placebo-controlled Phase 2b trial evaluating GEN-003 for the treatment of genital herpes infections. Even in a trial this small, at six months after dosing, GEN-003 demonstrated statistically significant improvements versus placebo across multiple clinical endpoints.

*       *       *

"We are very pleased to have demonstrated such a powerful impact on genital herpes clinical disease in this trial, supporting the groundbreaking potential of GEN-003 to be the first-ever therapeutic vaccine for a chronic infection and the first advance in the treatment of genital herpes in more than 20 years," said Chip Clark, president and chief executive officer of Genocea. "We look forward to meeting with the FDA in the first quarter of 2017 and to *commencing our GEN-003 Phase 3 program in the fourth quarter of 2017.* It's an exciting time for

14

Genocea as we also continue to extend the potential of our ATLAS platform to harness the power of T cells in immuno-oncology." [Emphasis added].

32.    On February 16, 2017, Defendants caused the Company to issue a press release that stated that the Company expected to have sufficient resources to fund the expenses for the Phase 3 trial, without the need to pursue debt or equity financing.  The press release stated in relevant part:

### Genocea Reports Fourth Quarter and Year-End 2016 Financial Results

-    Positive Phase 2b clinical data confirm attractive profile for GEN-003; expected to start Phase 3 program in 4Q 2017

-    Neoantigen cancer vaccine program on track to file first IND by end of 2017

-    Conference call at 9am ET today

* * *

Anticipated Upcoming Milestones and Events Milestones

•    1Q 2017: GEN-003 end-of-Phase 2 meeting with the U.S. Food and Drug Administration (FDA) expected; will confirm the design of the GEN-003 Phase 3 program

•    2H 2017: GEN-003 24-month Phase 2 data expected; will inform likely timing of maintenance dosing for GEN-003

•    2H 2017: GEN-003 12-month Phase 2b data anticipated; expected to reconfirm clinical profile of GEN-003 at 1-year post dosing

•    4Q 2017: **GEN-003 Phase 3 program start expected**

•    4Q 2017: GEN-009 neoantigen cancer vaccine Investigational New Drug (IND) application filing expected

* * *

### Financial Guidance

**Genocea expects that its existing cash, cash equivalents and investments are sufficient to support its operating expenses and capital expenditure requirements into the first quarter of 2018, without assuming any receipt of**

*proceeds from potential business development partnerships, equity financings or debt drawdowns. This guidance assumes commencing Phase 3 trials for GEN-003 for genital herpes in the fourth quarter of 2017* and filing an IND for GEN-009 for cancer by the end of the year, however it is Genocea's strategy to secure additional sources of financing in advance of starting GEN-003 Phase 3 clinical trials. [Emphasis added].

33.     On February 17, 2017, Defendants caused the Company to file a Form 10-K with the SEC that announced the Company's financial and operating results for the fourth fiscal quarter and year ended December 31, 2016 ("2016 Form 10-K"). The 2016 Form 10-K the Company stated in relevant part:

GEN-003 also continues to demonstrate a safety profile appropriate for its therapeutic setting in the judgment of the trial's independent Drug Monitoring Committee. There was no grade 4 reactogenicity or related serious AEs and discontinuations due to AEs were low and similarly distributed across active dose groups and placebo.

We intend to conduct an end-of-Phase 2 meeting with the FDA in early 2017. *We also expect to commence Phase 3 trials in the fourth quarter of 2017*. We plan to commence a clinical trial exploring the potential additive effects of GEN-003 on top of daily administration of valacyclovirin parallel with the Phase 3 program. *We retain all rights to GEN-003 and our strategy is to execute a partnership to maximize the potential of GEN-003 and to help fund the costs of the GEN-003 Phase 3 program*. [Emphasis added].

34.     On May 04, 2017, Defendants caused the Company to issue a press release that reinforced previous filings that the Phase 3 program for GEN-003 was expected to initiate in the second half of 2017. The press release stated in relevant part:

**Genocea Reports First Quarter 2017 Financial Results and Positive Clinical Developments on Lead Candidate GEN-003 in Genital Herpes**

-     Data from GEN-003 Phase 2 trial indicate initial course of injections sustains clinical and virologic efficacy for at least 24 months

-     ***End of Phase 2 meeting successfully completed for GEN-003; expect to be Phase 3-ready by end of 2017***

-     Neoantigen cancer vaccine candidate GEN-009 IND filing expected by end of 2017

16

-   Conference call today at 9am ET

CAMBRIDGE, Mass., May 4, 2017 - Genocea Biosciences, Inc. (NASDAQ: GNCA), a biopharmaceutical company developing T cell-directed vaccines and immunotherapies, today reported financial results for the first quarter of 2017 and announced several positive clinical developments on GEN-003, the company's candidate immunotherapy for the treatment of genital herpes.

In a Phase 2 study, GEN-003 demonstrated sustained reductions compared to baseline in the genital lesion rate (percent of days with genital lesions) and the viral shedding rate (percent of days with detectable virus) in genital herpes patients 24 months after dosing across multiple dose groups (see detailed data below). In addition, Genocea has now successfully completed its End of Phase 2 meeting with the U.S. Food and Drug Administration (FDA) and *continues to expect GEN-003 to be ready for Phase 3 development by the end of 2017*.

Chip Clark, president and chief executive officer of Genocea commented on the results: "These long-term durability data reinforce our conviction that GEN-003 could become the cornerstone treatment for patients with genital herpes. We believe the data suggest a single course of treatment of GEN-003 could offer significant clinical, virologic and convenience benefits to patients generally, and especially those dissatisfied with current treatments, for at least 2 years with no maintenance dosing. Given our successful End of Phase 2 meeting with the FDA, we continue to plan a Phase 3 program design consistent with previous guidance. We believe that these new data, together with the body of positive clinical results to date and these FDA discussions, give us momentum to advance our pioneering product candidate to Phase 3 readiness this year." [Emphasis added].

35.     On May 5, 2017, Defendants caused the Company to file a Form 10-Q ("2017 Q1 Form 10-Q") with the SEC, for the first fiscal quarter ended March 31, 2017 that disclosed that the Company expected to secure additional funding to finance the Phase 3 for GEN-003, but that the Company had the ability to fund operations until at least 1 more year from the date of the quarterly report. In the 2017 Q1 Form 10-Q, the Company stated in relevant part:

**Liquidity**

As of March 31, 2017, the Company had an accumulated deficit of approximately $221.2 million. The Company had cash, cash equivalents and investments of $48.7 million at March 31, 2017. *The Company expects that existing cash, cash equivalents and investments are sufficient to support operating expenses, capital expenditure requirements, and debt obligations into the first quarter of*

*2018, without assuming any receipt of proceeds from potential business development partnerships or equity financings*. This guidance assumes the Company commences a Phase 3 clinical trial for GEN-003 for genital herpes around the end of 2017 and files an IND for GEN-009 for cancer by the end of 2017; however, it is the Company's strategy to secure additional sources of financing in advance of starting GEN-003 Phase 3 clinical trials. *The Company has the ability to modify its operating plans in order to fund operations through at least one year from the issuance of this quarterly report*.

\*     \*     \*

Around the end of the first quarter of 2017, we had a successful end-of-Phase meeting with the FDA, the outcome of which was aligned with our previously disclosed Phase 3 design expectations. *We continue to expect that GEN-003 will be Phase 3-ready in the fourth quarter of 2017*. We plan to commence a clinical trial exploring the potential additive effects of GEN-003 on top of daily administration of valacyclovir in parallel with the Phase 3 program. We retain all rights to GEN-003 and if GEN-003 successfully completes clinical development and is approved, we believe it would represent an important new treatment option for patients with genital herpes. [Emphasis added].

## THE TRUTH BEGINS TO EMERGE

36.     On September 25, 2017, after the market closed, Genocea issued a press release ("Sept. 2017 Press Release"), also attached as Exhibit 99.1 to the Form 8-K filed with the SEC, announcing that the Company was ceasing GEN-003 spending and activities and was reducing its workforce by approximately 40 percent. In the press release, the Company stated, in pertinent part:

**Genocea Announces Strategic Shift to Immuno-oncology and the Development of Neoantigen Cancer Vaccines**

-       Superior ATLASTM platform for neoantigen selection (1)

-       Exploring strategic alternatives for GEN-003

-       Announces corporate restructuring

CAMBRIDGE, Mass., September 25, 2017 - Genocea Biosciences, Inc. (NASDAQ: GNCA), a biopharmaceutical company discovering and developing novel vaccines and immunotherapies targeting T cell antigens, today announced a strategic shift to immuno-oncology and a focus on the development of neoantigen

cancer vaccines, including GEN-009, its lead candidate for which it expects to file an Investigational New Drug (IND) application by early 2018. ***Genocea also announced it is exploring strategic alternatives for GEN-003, its Phase 3-ready investigational immunotherapy for the treatment of genital herpes. Consequently, Genocea is ceasing GEN-003 spending and activities and is reducing its workforce by approximately 40 percent.*** [Emphasis added].

37.    On April 21, 2017, Defendants caused the Company to file with the SEC the Company's 2017 Proxy Statement in connection with the Company's 2017 Annual Meeting of Stockholders, which was held on June 13, 2017.

38.    In the 2017 Proxy Statement, the Board recommended that Company's stockholders vote to re-elect Defendants Clark, Cooper, and Siber to the Board and ratify the appointment of Ernst & Young LLP as the independent registered public accounting firm for the Company for fiscal year ending December 31, 2017.

39.    The 2017 Proxy stated in relevant part:

**Board of Directors' Role in Risk Oversight**

The Board of Directors plays an important role in risk oversight through direct decision-making authority with respect to significant matters as well as through the oversight of management by the Board of Directors and its committees. In particular, the Board of Directors administers its risk oversight function through (1) the review and discussion of regular periodic reports by the Board of Directors and its committees on topics relating to the risks that we face, (2) the required approval by the Board of Directors (or a committee of the Board of Directors) of significant transactions and other decisions, (3) the direct oversight of specific areas of our business by the Audit, Compensation and Nominating and Corporate Governance Committees, and (4) regular periodic reports from the auditors and other outside consultants regarding various areas of potential risk, including, among others, those relating to our internal control over financial reporting and executive compensation. The Board of Directors also relies on management to bring significant matters impacting our Company to the attention of the Board of Directors.

Pursuant to the Audit Committee's charter, the Audit Committee is responsible for reviewing and discussing with management and the independent registered public accounting firm our system of internal controls, our critical accounting practices, and policies relating to risk assessment and management. As part of this process, the Audit Committee discusses our major financial risk exposures

and steps that management has taken to monitor and control such exposure.  In addition, the Audit Committee has established procedures for the receipt, retention and treatment of complaints received by the Company regarding accounting, internal accounting controls or auditing matters, and the confidential, anonymous submissions by employees of concerns regarding questionable accounting or accounting matters.

40.    The 2017 Proxy Statement falsely stated that: (a) the Board and the Audit Committee provided adequate oversight and ability to manage risks, and to control exposure to financial risks; and (b) sufficient controls were in place to ensure management brought significant matters to the attention of the Board.

41.    The 2017 Proxy Statement also failed to inform the Company stockholders that: (a) the Company's finances were insufficient to support Phase 3 trials of GEN-003; (b) the Company had overstated the prospects for GEN-003; and (c) the Company failed to maintain adequate internal controls.

42.    On May 4, 2017, Defendants caused the Company to issue a press release that emphasized statements in previous filings that the Phase 3 program for GEN-003 was expected to initiate in the second half of 2017.  The press release stated in relevant part:

### *Genocea Reports First Quarter 2017 Financial Results and Positive Clinical Developments on Lead Candidate GEN-003 in Genital Herpes*

-       Data from GEN-003 Phase 2 trial indicate initial course of injections sustains clinical and virologic efficacy for at least 24 months

-       ***End of Phase 2 meeting successfully completed for GEN-003; expect to be Phase 3-ready by end of 2017***

-       Neoantigen cancer vaccine candidate GEN-009 IND filing expected by end of 2017

-       Conference call today at 9am ET

CAMBRIDGE, Mass., May 4, 2017 - Genocea Biosciences, Inc. (NASDAQ: GNCA), a biopharmaceutical company developing T cell-directed vaccines and immunotherapies, today reported financial results for the first quarter of 2017 and

announced several positive clinical developments on GEN-003, the company's candidate immunotherapy for the treatment of genital herpes.

In a Phase 2 study, GEN-003 demonstrated sustained reductions compared to baseline in the genital lesion rate (percent of days with genital lesions) and the viral shedding rate (percent of days with detectable virus) in genital herpes patients 24 months after dosing across multiple dose groups (see detailed data below).  In addition, Genocea has now successfully completed its End of Phase 2 meeting with the U.S. Food and Drug Administration (FDA) and ***continues to expect GEN-003 to be ready for Phase 3 development by the end of 2017***.

Chip Clark, president and chief executive officer of Genocea commented on the results: "These long-term durability data reinforce our conviction that GEN-003 could become the cornerstone treatment for patients with genital herpes.  We believe the data suggest a single course of treatment of GEN-003 could offer significant clinical, virologic and convenience benefits to patients generally, and especially those dissatisfied with current treatments, for at least 2 years with no maintenance dosing. Given our successful End of Phase 2 meeting with the FDA, we continue to plan a Phase 3 program design consistent with previous guidance.

We believe that these new data, together with the body of positive clinical results to date and these FDA discussions, give us momentum to advance our pioneering product candidate to Phase 3 readiness this year."  [Emphasis added].

43.     On May 5, 2017, Defendants caused the Company to file a Form 10-Q for the period ending March 31, 2017 (the "1Q 2017 Form 10-Q").  The 1Q 2017 Form 10-Q states in relevant part:

**Liquidity**

As of March 31, 2017, the Company had an accumulated deficit of approximately $221.2 million. The Company had cash, cash equivalents and investments of $48.7 million at March 31, 2017. ***The Company expects that existing cash, cash equivalents and investments are sufficient to support operating expenses, capital expenditure requirements, and debt obligations into the first quarter of 2018, without assuming any receipt of proceeds from potential business development partnerships or equity financings.***  This guidance assumes the Company commences a Phase 3 clinical trial for GEN-003 for genital herpes around the end of 2017 and files an IND for GEN-009 for cancer by the end of 2017; however, it is the Company's strategy to secure additional sources of financing in advance of starting GEN-003 Phase 3 clinical trials. ***The Company has the ability to modify its operating plans in order to fund operations through at least one year from the issuance of this quarterly report***.

\* \* \*

Our lead program is GEN-003, a Phase 2 candidate therapeutic vaccine, or immunotherapy, that we are developing to treat genital herpes infections. We have completed two positive clinical trials and have a third clinical trial currently underway which has also demonstrated positive interim efficacy results.

\* \* \*

In December 2015, a Phase 2b clinical trial was initiated as our first study testing potential Phase 3 endpoints with a Phase 3-ready formulation of GEN-003, manufactured with commercially-scalable processes.

\* \* \*

In September 2016, we announced positive viral shedding rate reductions from the ongoing Phase 2b study. The study achieved its primary endpoint[.] . . .

\* \* \*

In January 2017, we announced further positive clinical results from the ongoing Phase 2b clinical trial.

\* \* \*

Around the end of the first quarter of 2017, we had a successful end-of-Phase 2 meeting with the FDA, the outcome of which was aligned with our previously disclosed Phase 3 design expectations. We continue to expect that GEN-003 will be Phase 3-ready in the fourth quarter of 2017. We plan to commence a clinical trial exploring the potential additive effects of GEN-003 on top of daily administration of valacyclovir in parallel with the Phase 3 program. We retain all rights to GEN-003 and if GEN-003 successfully completes clinical development and is approved, we believe it would represent an important new treatment option for patients with genital herpes. [Emphasis added].

44. On July 24, 2017, Defendants caused the Company issued a press release that announced that the Company was giving a presentation to investors regarding the positive clinical results for the twelve-month analysis of the Company's Phase 2b trial of GEN-003. The press release and presentation were attached as exhibits. In the press release, the Company stated in part:

In this 131-subject Phase 2b clinical trial, GEN-003 reduced the median genital

22

lesion rate (or percent days with genital lesions) versus placebo by 49 percent (p=0.01) over the 12 months' post dosing at the 60 µg per antigen / 50 µg of adjuvant dose. Importantly, these results were achieved at the Phase 3 dose and expected Phase 3 primary endpoint. Other clinical endpoints for this dose improved or were consistent with previously reported positive data. No changes were observed to the previously established safety profile of GEN-003.

Chip Clark, President and CEO of Genocea, commented: "We believe these data further solidify the strong clinical profile for GEN-003, which could provide durable, convenient efficacy to a large and, we believe, highly dissatisfied patient population and serve as a cornerstone treatment of this burdensome disease."

45.     On August 9, 2017, Defendants caused the Company to issue a press release that stated that the Company expected to have sufficient capital to support its operating expenses and capital expenditures into 2018, but did not intend to commence Phase 3 development of GEN-003 until it secured capital:

**Genocea Biosciences Reports Second Quarter 2017 Financial Results**

\*     \*     \*

Chip Clark, president and chief executive officer of Genocea commented: "We are delighted with the recent positive GEN-003 12-month Phase 2b data and continue to explore means of securing capital to enable the start of Phase 3. We believe that, if approved, GEN-003 could become the first new therapy to treat genital herpes in more than 20 years and address serious unmet patient needs.

\*     \*     \*

**Financial Guidance**

Genocea expects that its existing cash and cash equivalents are sufficient to support its operating expenses and capital expenditure requirements into 2018. Genocea is currently exploring various avenues to secure capital to advance GEN-003 into Phase 3 trials and does not intend to commence Phase 3 development of GEN-003 until it has secured such capital.

46.     On August 9, 2017, Defendants caused the Company to file a Form 10-Q for the period ending June 30, 2017 (the "2Q 2017 Form 10-Q").  The 2Q 2017 Form 10-Q stated in relevant part:

**Liquidity**

As of June 30, 2017, the Company had an accumulated deficit of approximately $236.6 million.  The Company had cash and cash equivalents of $35.2 million at June 30, 2017, which it believes is not sufficient to fund the Company's current operating plan *for at least the next twelve months from the date of filing this Quarterly Report on Form 10-Q*.  The Company expects to seek additional funds through equity or debt financings.  It may be unable to obtain equity or debt financings and, if necessary, the Company will be required to implement cost reduction strategies, including ceasing development of GEN- 003.  These factors raise substantial doubt about the Company's ability to continue as a going concern.

\* \* \*

In June and September 2016, the Company entered into new statements of work under the agreement with Fujifilm for the manufacture and supply of antigens for the Company's Phase 3 clinical trials for GEN-003.

\* \* \*

In July 2017, we announced positive clinical results from the Phase 2b trial.  At twelve months after dosing, GEN-003 demonstrated statistically significant improvements versus placebo in both the median genital lesion rate and across multiple clinical endpoints.  Importantly, these results were achieved at the Phase 3 dose and expected Phase 3 primary endpoint.

\* \* \*

In our planned Phase 3 trial, we expect to have a much larger sample size from the hundreds of patients from whom we plan to collect viral shedding samples, and we believe that this larger sample size may lead to greater differentiation in viral shedding in GEN-003 subjects versus placebo.

\* \* \*

Around the end of the first quarter of 2017, we had a successful end-of-Phase 2 meeting with the U.S Food and Drug Administration or FDA, the outcome of which was aligned with our previously disclosed Phase 3 design expectations.

\* \* \*

***We expect that our existing cash and cash equivalents, are sufficient to support our operating expenses and capital expenditure requirements into 2018.***  We are currently exploring various avenues to secure capital to advance GEN-003 into Phase 3 trials and we do not intend to commence Phase 3 development of GEN-

003 until we have secured such capital.  [Emphasis added].

47.     On August 9, 2017, Defendants caused the Company to issue a press release that stated that the Company expected to have sufficient capital to support its operating expenses and capital expenditures into 2018 but did not intend to commence Phase 3 development of GEN-003 until it secured capital.

48.     On this news, the Company's share price fell over $.70 or over 14.5% to close at $4.11 on August 9, 2017.

49.     On August 9, 2017, Defendants caused the Company to release its 2Q 2017 Form 10-Q that announced that the Company did not have sufficient capital to "fund the Company's current operating plan for at least the next twelve months from the date of filing this Quarterly Report on Form 10-Q" and that the Company might have to cease development of GEN-003 if unable to secure equity or debt financing.

50.     On this news, the Company's share price fell over $.30 or over 7.2% to close at $3.81 on August 10, 2017.

## THE TRUTH FINALLY EMERGES

51.     On September 25, 2017, Defendants caused the Company to issue a press release that stated that the Company "is exploring strategic alternatives for GEN-003, its Phase 3-ready investigational immunotherapy for the treatment of genital herpes.  Consequently, Genocea is ceasing GEN-003 spending and activities and is reducing its workforce by approximately 40 percent."

52.     On this news, the Company's share price fell $4.08 or 76.5% to close at $1.25 on September 26, 2017.

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

53.     Plaintiff brings this action derivatively in the right and for the benefit of the Company to redress injuries suffered and to be suffered as a direct and proximate result of the breaches of fiduciary duties by Defendants.

54.     Plaintiff will adequately and fairly represent the interests of the Company and its shareholders in enforcing and prosecuting its rights and has retained counsel competent and experienced in derivative litigation.

55.     Plaintiff is a current owner of the Company stock and has continuously been an owner of the Company stock during times relevant to Defendants' wrongful course of conduct alleged herein.  Plaintiff understands her obligation to hold stock throughout the duration of this action and is prepared to do so.

56.     During the aforesaid wrongful course of conduct at the Company, the Board consisted of Defendants Bate, Clark, Cooper, Bosley, Siber, Higgins, and Mayer (and non-party Ali Behbahani, M.D.).  Because of the facts set forth throughout this Complaint, demand on the Board to institute this action is not necessary because such a demand would have been a futile and useless act.

57.     The Board is currently comprised of eight (8) members – Defendants Bate, Clark, Cooper, Bosley, Siber, Higgins, and Mayer, and non-party Ali Behbahani, M.D.  Thus, Plaintiff is required to show that a majority of Defendants, *i.e.*, four (4), cannot exercise independent, objective judgment about whether to bring this action or whether to vigorously prosecute this action.

58.     Defendants face a substantial likelihood of liability in this action because they caused the Company to issue false and misleading statements concerning its future prospects. Because of their advisory, executive, managerial, and directorial positions with the Company,

each of the Defendants had knowledge of material non-public information regarding the Company and was directly involved in the operations of the Company at the highest levels.

59.     As a result of the aforesaid false and misleading statements, the Company has been made a defendant in the Securities Class Actions and will be forced to expend time and treasure defending itself in that Securities Class Actions.

60.     Defendants either knew or should have known of the false and misleading statements that were issued on the Company's behalf and took no steps in a good faith effort to prevent or remedy that situation.

61.     Defendants (or at the very least a majority of them) cannot exercise independent objective judgment about whether to bring this action or whether to vigorously prosecute this action.  For the reasons that follow, and for reasons detailed elsewhere in this complaint, Plaintiff has not made (and should be excused from making) a pre-filing demand on the Board to initiate this action because making a demand would be a futile and useless act.

62.     Defendants approved and/or permitted the wrongs alleged herein to have occurred and participated in efforts to conceal or disguise those wrongs from the Company's stockholders or recklessly and/or with gross negligence disregarded the wrongs complained of herein and are therefore not disinterested parties.

63.     Defendants authorized and/or permitted the false statements to be disseminated directly to the public and made available and distributed to shareholders, authorized and/or permitted the issuance of various false and misleading statements, and are principal beneficiaries of the wrongdoing alleged herein, and thus, could not fairly and fully prosecute such a suit even if they instituted it.

64.     Because of their participation in the gross dereliction of fiduciary duties, and breaches of the duties of due care, good faith, and loyalty, Defendants are unable to comply with

their fiduciary duties and prosecute this action.

65.     Additionally, each of the Defendants received payments, benefits, stock options, and other emoluments by virtue of their membership on the Board and their control of the Company.

## DEFENDANTS ARE NOT INDEPENDENT OR DISINTERESTED

### Defendant Clark

66.     Defendant Clark is a named defendant in the Securities Class Actions.

67.     Defendant Clark faces substantial liability in the Securities Class Actions.  Here, it would have been futile for Plaintiff to demand that Defendant Clark commence the instant litigation because he is personally interested in the outcome of the Securities Class Actions in that the he will personally benefit or suffer as a result of the lawsuit, and the allegation in the Securities Class Actions are based on the same operative facts alleged herein.

68.     Further, Defendant Clark is President and CEO of the Company and derives substantially all of his income from his employment with the Company, making him not independent.   As such, Defendant Clark cannot independently consider any demand to sue himself for breaching his fiduciary duties to the Company, because that would expose him to liability and threaten his livelihood.

### Defendant Siber

69.     The Company has entered into a consulting agreement with Defendant Siber.  The consulting agreement was amended on each of June 30, 2009, December 16, 2010, June 15, 2011, June 5, 2013 and June 15, 2015 and is in effect through June 17, 2017.  Pursuant to the consulting agreement, Siber performs various consulting services for the Company, including determining the Company's general scientific and business direction, recruitment of scientific

advisory Board members and consultants, recruitment of full-time management and scientific personnel and identifying and reviewing scientific developments and intellectual property.

70.     Defendant Siber derives substantial income from his consulting agreement with the Company.  Thus, Defendant Siber cannot independently consider any demand to sue himself for breaching his fiduciary duties to the Company because that would expose him to liability and threaten his livelihood.

**Defendant Higgins**

71.     In January 2015, Defendant Higgins joined Polaris Venture Partners.

72.     Polaris Venture Partners owns 6.9% of the Company's outstanding stock.

73.     Defendant Higgins works for Polaris Venture Partners (a major shareholder of Company stock).

74.     Further, as the Chairman of the Audit Committee, Defendant Higgins was responsible to monitor internal control over financial reporting, disclosure controls and procedures and code of business conduct and ethics and oversee risk assessment and risk management policies.  Defendant Higgins failed to meet his responsibilities as evidenced by the corporate misconduct as alleged herein.

**Defendant Bate**

75.     As a member of Audit Committee, Defendant Bate was responsible to monitor internal control over financial reporting, disclosure controls and procedures and code of business conduct and ethics and oversee risk assessment and risk management policies.  Defendant Bate failed to meet his responsibilities as evidenced by the corporate misconduct as alleged herein.

**Defendant Cooper**

76.     As a member of Audit Committee, Defendant Cooper was responsible to monitor

internal control over financial reporting, disclosure controls and procedures and code of business conduct and ethics and oversee risk assessment and risk management policies.   Defendant Cooper failed to meet his responsibilities as evidenced by the corporate misconduct as alleged herein.

## FIRST CAUSE OF ACTION

### (Against Defendants for Breach of Fiduciary Duties)

77.     Plaintiff incorporates by reference and re-alleges each and every allegation contained above, as though fully set forth herein.

78.     Defendants owe the Company fiduciary obligations.  By reason of their fiduciary relationships, Defendants owed and owe the Company the highest obligation of good faith, fair dealing, loyalty, and due care.

79.     Defendants violated and breached their fiduciary duties of care, loyalty, reasonable inquiry, and good faith.

80.     Defendants engaged in a sustained and systematic failure to properly exercise their fiduciary duties.  In breach of their fiduciary duties owed to the Company, Defendants made false and/or misleading statements and/or failed to disclose that: (a) the Company's finances were insufficient to support Phase 3 trials of GEN-003; (b) the Company had overstated the prospects for GEN-003; and (c) the Company failed to maintain adequate internal controls.

81.     Defendants had actual knowledge of the above misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth, in that they failed to ascertain and to disclose such facts, even though such facts were available to them.

82.     As a direct and proximate result of Defendants' failure to perform their fiduciary obligations, the Company has sustained significant damages.  As a result of the misconduct

alleged herein, Defendants are liable to the Company.

83.     As a direct and proximate result of Defendants' breach of their fiduciary duties, the Company has suffered damage, not only monetarily, but also to its corporate image and goodwill.   Such damage includes, among other things, costs associated with defending the Securities Class Actions, severe damage to the share price of the Company, resulting in an increased cost of capital, the waste of corporate assets, and reputational harm.

## SECOND CAUSE OF ACTION

### (Against Defendants for Violations of Section 14(a) of the Securities Exchange Act of 1934)

84.     Plaintiff incorporates by reference and re-alleges each and every allegation above as though fully set forth herein.

85.     Rule 14a-9, promulgated pursuant to Section 14(a) of the Securities Exchange Act of 1934, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading."  17 C.F.R. § 240.14a-9.

86.     Here, the 2017 Proxy Statement urged stockholders to re-elect Clark, Cooper and Siber.  However, the 2017 Proxy Statement misleadingly suggested that: (a) the Board and the Audit Committee provided adequate oversight and ability to manage risks, and to control exposure to financial risks; and (b) sufficient controls were in place to ensure management brought significant matters to the attention of the Board.  In addition, the 2017 Proxy Statement failed to disclose that: (a) the Company's finances were insufficient to support Phase 3 trials of GEN-003; (b) the Company had overstated the prospects for GEN-003; and (c) the Company failed to maintain adequate internal controls.  Had this information been known, the Company

stockholders would not have voted to re-elect the offending directors.

87.    As a consequence of the foregoing, the Company was damaged as a result of Defendants' material misrepresentations and omissions.

### THIRD CAUSE OF ACTION

### (Against Individual Defendants for Unjust Enrichment)

88.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

89.    By their wrongful acts and false and misleading statements and omissions of material fact which they made and/or caused to be made, Individual Defendants were unjustly enriched at the expense of, and to the detriment of, Genocea.

90.    Individual Defendants either benefitted financially from the improper conduct and false and/or misleading statements by receipt of funds, stock options and compensation from Genocea that was unjust in light of Individual Defendants' bad faith conduct.

### FOURTH CAUSE OF ACTION

### (Against Individual Defendants for Waste of Corporate Assets)

91.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

92.    By their wrongful acts and false and misleading statements and omissions of material fact that Individual Defendants made and/or caused to be made, Individual Defendants have caused Genocea to waste its assets by paying improper compensation and bonuses to certain of its executive officers and directors that breached their fiduciary duty, and expending valuable resources in defending against the securities class actions brought about by improper statements.

## REQUEST FOR RELIEF

**WHEREFORE**, Plaintiff demands judgment as follows:

A.    Determining that this action is a proper derivative action maintainable under law, and that demand is excused;

B.    Awarding, against all Defendants and in favor of the Company, the damages sustained by the Company as a result of Defendants' wrongful conduct, including breaches of their fiduciary duties;

C.    Directing the Company to take all necessary actions to reform and improve its corporate governance and internal procedures, to comply with the Company's existing governance obligations and all applicable laws and to protect the Company and its investors from a recurrence of the damaging events described herein;

D.    Awarding to Plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

E.    Granting such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury.

DATED: June 20, 2018

**O'KELLY ERNST & JOYCE, LLC**

By: */s/ Ryan M. Ernst*
Ryan M. Ernst (#4788)
Daniel P. Murray (#5785)
901 N. Market St., Suite 1000
Wilmington, DE 19801
Tel.: (302) 778-4000
Email: rernst@oelegal.com
Email: dmurray@oelegal.com

**GAINEY McKENNA & EGLESTON**
Thomas J. McKenna
Gregory M. Egleston
440 Park Avenue South
New York, NY  10016
Telephone: (212) 983-1300
Facsimile: (212) 983-0380
Email: tjmckenna@gme-law.com
Email: gegleston@gme-law.com

*Attorneys for Plaintiff*